LA SALLE NATIONAL BANK, n/k/a La Salle National Bank, N.A., as Trustee, Plaintiff and Counterdefendant, v. CARLYN J. MALIK, Indiv., *et al.*, Defendants and Counterplaintiffs (Carlyn J. Malik *et al.*, Third-Party Plaintiffs-Appellants and Cross-Appellees; Kiannosh Jafari *et al.*, Third-Party Defendants-Appellees; Swissler Brothers Plumbing, Inc., *et al.*, Third-Party Defendants-Appellees and Cross-Appellants).

Second District    No. 2—98—0028

Opinion filed January 20, 1999.

Rick M. Schoenfield and Daniel Swartzman, both of Schoenfield, Swartzman & Massin, of Chicago, for appellants.

David J. Cahill and Matthew D. Jacobson, both of Swanson, Martin & Bell, of Wheaton, for appellees Jack Swissler and Swissler Brothers Plumbing, Inc.

E. Kent Ayers and John M. Spesia, both of Spesia, Ayers, Ardaugh & Wunderlich, of Joliet, for appellees Kiannosh Jafari, Soussan Jafari, and George Olson.

Peter A. Tomaras, Jeanne E. Walker, and Anne-Marie Dega, all of Wildman, Harrold, Allen & Dixon, of Chicago, for appellee 3M Company.

JUSTICE THOMAS delivered the opinion of the court:

La Salle National Bank, n/k/a La Salle National Bank, N.A., as trustee under trust No. 113573, filed a breach of lease claim against Dr. Carlyn J. Malik, individually, and Carlyn J. Malik, M.D., S.C. The complaint for breach of lease was dismissed without prejudice for failure to prosecute and is not at issue in the instant appeal. Carlyn J. Malik, Cynthia Krystozek, Chester Obrochta and Pamela Kufahl (plaintiffs) then filed a third-party complaint for personal injuries against Kiannosh Jafari, Soussan Jafari, George Olson, Swissler Brothers Plumbing, Inc., Jack Swissler, and 3M Company (defendants). Following discovery, the trial court granted defendants' motion to bar plaintiffs' expert witnesses and then granted defendants' motions for

summary judgment. Plaintiffs now timely appeal the trial court's order barring their expert witnesses and granting summary judgment in favor of defendants. In addition, defendants Jack Swissler and Swissler Brothers Plumbing, Inc., have filed a cross-appeal contending that the trial court should have granted summary judgment in their favor on the additional ground that plaintiffs could not show proximate cause between plaintiffs' injuries and the actions of the Swissler defendants.

The pleadings, depositions, admissions, and affidavits on file show the following. Plaintiff Dr. Carlyn Malik opened an otolaryngology practice in May 1991 in a suite of offices on the second floor of the Oak Brook Surgical Centre (Centre). Dr. Malik divided her time between her office at the Centre and her office in Naperville, Illinois. Defendants Kiannosh Jafari and Soussan Jafari (the Jafaris) were the beneficial owners of the Centre through a land trust. Malik employed plaintiffs Cynthia Krystozek and Pamela Kufahl, and plaintiff Chester Obrochta was employed by defendants Kiannosh and Soussan Jafari to perform maintenance work at the Centre. In June 1991, an ethylene oxide (EtO) sterilizer, which is used to sterilize medical instruments, was installed on the first floor of the Centre. Defendants Jack Swissler and Swissler Brothers Plumbing, Inc., installed the pipes that vented the EtO to the roof of the Centre. Defendant 3M Company manufactured the EtO sterilizer, provided installation instructions for the venting system, and inspected the venting system after it was installed.

EtO is a colorless, flammable, and highly reactive compound. EtO gas is heavier than air and is odorless at concentrations of less than 700 parts per million. EtO exposure can cause injuries to the central nervous system, the peripheral nervous system, and the mucous membranes. The 3M Company installation guide for the sterilizer required that the termination of a copper vent line leading from the sterilizer to the rooftop be no closer than 25 feet from any fresh air source, although the guide provided that greater distances might be needed in some cases. The 25-foot distance requirement is 10 feet farther than the distance required under the Illinois Administrative Code (77 Ill. Adm. Code § 205.1540(d) (eff. May 17, 1982)). From June 27, 1991, to June 1, 1992, 84 sterilization cycles were run, although the cycles were not run according to a fixed schedule. From June 1, 1992, to October 5, 1992, when Dr. Malik vacated her suite at the Centre, 16 sterilization cycles were run.

In June 1992, plaintiffs began complaining about odors and air quality problems in their suite. Dr. Malik described the odor as a "burning metal" smell and said that she noticed it on Tuesdays and sometimes on Thursdays. Dr. Malik also said that she observed gas

venting into her suite. Krystozek said the odor was a "burning like" smell and also said she observed a haze coming from the ceiling. Kufahl said she saw a blue-green haze coming from the ceiling. Plaintiffs all suffered central nervous system damage, peripheral nervous system damage, and damage to their mucous membranes.

In response to plaintiffs' complaints, James Doumouras of Northwest Envirocon performed two surveys at the Centre on September 23, 1992, and on October 1, 1992. Doumouras took readings at the exhaust stack on the roof of the Centre, at the site of the sterilizer, and in two areas in Dr. Malik's suite. The sterilizer was running on September 23, 1992. Doumouras did not specifically test for EtO but did test for elevated levels of volatile organic compounds. Doumouras said that if there were elevated levels of EtO, they would have shown up in his tests. The tests showed no elevated levels of volatile organic compounds. In his summary of the surveys, however, Doumouras noted that "[v]isual inspection and measure procedure indicate that the surgical sterilizer unit exhaust stack and a major air handling unit intake are too close in proximity, causing sterilizer exhaust gases to be vacuumed into the path of the intake."

Chad Chariton, an employee of AMSCO, testified in his deposition that he tested the sterilizer and the ventilation system for any EtO leaks on August 28, 1992. Chariton said that the sterilizer was running and was ready to go into the exhaust phase before he did his testing. Chariton said that he used a leak detector to check the area around the sterilizer, in a storage area next to Dr. Malik's suite, at the exhaust pipe on the roof, 25 feet away from the exhaust pipe, and in a room in Dr. Malik's suite. Chariton said that only the exhaust pipe indicated the presence of EtO at a level between 1 and 25 parts per million. The permissible exposure limit under the Occupational Safety and Health Administration (OSHA) standards is 1 part per million over an 8-hour time-weighted average and a maximum of 5 parts per million over a 15-minute time period.

Finally, on October 29, 1992, an employee of OSHA conducted an inspection at the Centre pursuant to plaintiffs' complaints. The inspection indicated that there was no exposure to EtO.

On October 5, 1992, Dr. Malik vacated her office at the Centre. On February 27, 1996, plaintiffs filed their fourth amended complaint, which alleged that the piping for the EtO sterilizer was improperly installed and did not adequately vent the EtO out of the Centre. Plaintiffs claimed that an outlet for the piping was placed in such a way that the EtO gas reentered the Centre and was inhaled by plaintiffs, causing neurological injuries. Plaintiffs alleged that beginning in June 1992 plaintiffs complained to defendants Jafaris and Ol-

son concerning smells and air quality in their suite at the Centre but that no corrective action was taken. Plaintiffs also alleged that defendants Jack Swissler and Swissler Brothers Plumbing, Inc., carelessly and negligently installed the pipes and that defendant 3M Company carelessly and negligently failed to properly reinstall the EtO sterilizer and failed to completely check the ventilation system.

Plaintiffs disclosed two expert witnesses in support of their case, Fred Boelter, an industrial hygienist and environmental engineer, and Dr. Stephen Hessl, an occupational medicine physician. Boelter's opinion was that a mansard-style screen around the Centre's roof parapet obstructed the air flow over the roof and restricted air circulation on the roof. The mansard screen raised the effective height of the roof so that the discharge stacks and the intakes should have been higher. Boelter also said that the positioning of the EtO vent line and the local exhaust duct below the top of the mansard screen inhibited the dilution and dispersion of the EtO discharged on the roof so that EtO was entrained and circulated into Dr. Malik's office. Dr. Hessl's opinion, based upon plaintiffs' complaints of exposure to EtO and upon Boelter's report, was that plaintiffs suffered from EtO toxicity.

Defendants filed a motion to bar plaintiffs' expert witnesses on the ground that their opinions were based upon mere speculation, guess, and conjecture and, thus, were unreliable and inadmissible. Defendants claimed that there was no factual basis to support Boelter's opinion that EtO was entrained into the fresh air intake and circulated into Dr. Malik's office. Defendants argued that because Boelter did not perform any calculations or do any testing to support his hypothesis, his opinion was merely a guess. In addition, defendants claimed that Dr. Hessl's opinion was mere guess and conjecture because he relied on Boelter's report to support his opinion that plaintiffs were exposed to EtO. Defendants noted that Dr. Hessl had testified in his deposition that he would not have considered EtO toxicity in examining plaintiffs if he had not been told that plaintiffs had been exposed to EtO.

As noted, the trial court granted defendants' motion to bar plaintiffs' experts. The trial court then granted defendants' motions for summary judgment on the ground that without expert testimony plaintiffs could not prove proximate cause. In granting defendants' motion to bar, the trial court held that the essential issue was whether the opinions of Boelter and Hessl met the minimum requirements of reliability under Illinois law. With regard to Boelter, the trial court stated that he could only speculate concerning his theory of negligent entrainment and circulation of the EtO and concerning his theory that plaintiffs may have been exposed to some undetermined concentration of EtO gas. Relying on *Allen v. Pennsylvania Engineer-*

*ing Corp.*, 102 F.3d 194 (5th Cir. 1996), and *Gyllin v. College Craft Enterprises, Ltd.*, 260 Ill. App. 3d 707 (1994), the trial court concluded that plaintiffs' expert testimony, at minimum, should have shown the harmful level of exposure to EtO and that plaintiffs were exposed to that level of EtO, in order to sustain their burden of proof. The trial court found that Boelter's opinion lacked an adequate foundation and thus was speculative. With regard to Dr. Hessl, the trial court noted that his opinion was supported in a large measure by Boelter's opinion and also found that the basis of his opinion was that there was a temporal relationship between the exhaust system, the fresh air intake system into Dr. Malik's office suite, and plaintiffs' presence in that suite. The trial court held that a temporal relationship was insufficient to prove proximate cause.

■ On appeal, plaintiffs raise several arguments concerning the proper standard to apply in admitting or excluding expert testimony. Plaintiffs contend that the trial court erred in applying the standard set forth in *City of Chicago v. Anthony*, 136 Ill. 2d 169 (1990), and argue that the trial court should have applied the standard set forth in *Melecosky v. McCarthy Brothers Co.*, 115 Ill. 2d 209 (1986). We need not decide whether the cases are mutually exclusive, however, as the supreme court in both cases held that the facts and data upon which an expert relies should be a type reasonably relied upon by experts in that field. See *Anthony*, 136 Ill. 2d at 186; *Melecosky*, 115 Ill. 2d at 216. Under either decision, the issue in this case is whether the trial court properly held that the facts and data upon which Boelter and Dr. Hessl based their opinions were not a type reasonably relied upon by experts in their respective fields.

■ The decision to admit expert testimony is within the trial court's discretion, and its decision will not be disturbed absent an abuse of discretion. *People v. Thill*, 297 Ill. App. 3d 7, 11 (1998). The trial court must critically evaluate the reasoning process by which an expert witness connects data to his conclusion and should not admit expert opinion that is based upon unreliable data and procedures. *Thill*, 297 Ill. App. 3d at 11. An expert's opinion cannot be based upon mere conjecture and guess. *Dyback v. Weber*, 114 Ill. 2d 232, 244 (1986). Nonetheless, where the issue is the admission or exclusion of the entire opinion testimony of an expert, a trial court should liberally allow the expert to determine what materials are reasonably relied upon by those in his field. *Lovelace v. Four Lakes Development Co.*, 170 Ill. App. 3d 378, 383 (1988). The opposing party may challenge the reliability or sufficiency of the expert's opinion on cross-examination, and the trier of fact then can determine the weight to be accorded the expert's opinion. *Lovelace*, 170 Ill. App. 3d at 384.

In his deposition, Boelter testified that (1) the pipe used by Swissler to vent the EtO was larger than that specified in the installation guide and a larger pipe may not be capable of fully purging the EtO from the system; (2) the pipe installed by Swissler had seven bends in it and the installation guide said to minimize the number of bends and contractions in the pipe; (3) there were obstructions present in the configuration of the Centre that required a greater separation between the vent pipe and the air intake; (4) the mansard screen obstructed the air flow over the roof, which prevented the mixing of the EtO gas as it was discharged from the vent; and (5) the mansard screen raised the effective height of the roof with regard to air flow so that the air underneath the mansard essentially was not moving. In support of his opinion, Boelter performed two inspections of the Centre and also relied upon an article in the Journal of the Air Waste and Management Association entitled "A Wind Tunnel Study into the Effects of Raised Intakes and Parapets on Fresh Air Intake Contamination by a Rooftop Stack."

Dennis Bridge, defendants' industrial hygiene expert, testified in his deposition that the mansard screen was a "non-issue" with respect to the way the building was configured because the vent pipe was more than 25 feet away from the fresh air intake and because the amount of EtO used per sterilization cycle was relatively small. Bridge also said that the mansard screen could conceivably add to the turbulence and dilution on the roof. Bridge testified that he did not see any justification for Boelter's conclusions and did not "totally" agree with all of Boelter's assumptions. Bridge testified that in a "worst case" scenario some EtO could have entered the air intake but that it would have been below any regulated level. Bridge acknowledged that the article relied upon by Boelter in forming his opinion was reliable literature with regard to mansard screens.

Dr. Hessl testified that his opinion, to a reasonable degree of medical certainty, was that plaintiffs were exposed to EtO in excess of OSHA permissible exposure limits. Dr. Hessl based his opinion on the fact that plaintiffs demonstrated evidence of EtO toxicity. In reaching his conclusions, Dr. Hessl relied upon Boelter's opinion that EtO was entrained and circulated into Dr. Malik's office; the history of plaintiffs; physical and laboratory reports on plaintiffs; and the reports of other physicians. Dr. Hessl said that he reviewed the OSHA report and the report prepared by Doumouras but believed those tests were flawed. Dr. Hessl testified that, in the practice of occupational medicine, physicians rely heavily on patient history and on what the patient tells the physician.

Defendants' medical expert, Dr. Coe, testified in his deposition

that he disagreed with Dr. Hessl's conclusions but stated that Dr. Hessl followed methods generally accepted by the medical community "as far as he went" and that Dr. Hessl "did what he could with the information that he had." Dr. Coe said that ideally Dr. Hessl would have visited the Centre, although he acknowledged that occupational medicine specialists often reach their conclusions without making a site inspection. Dr. Coe agreed that some level of EtO exposure can cause damage to the central nervous system, the peripheral nervous system, and the mucous membranes, although he did not believe the plaintiffs' symptoms in this case were caused by EtO exposure.

■ Based upon the foregoing, we believe the trial court erred in finding that the opinions of Boelter and Dr. Hessl were speculative and uncertain. We note that, although defendants' experts disagreed with the conclusions of plaintiffs' experts and with some of their procedures, defendants' experts did acknowledge that the data upon which Boelter and Dr. Hessl based their conclusions were reliable. Bridge conceded that some EtO could have been drawn into Dr. Malik's office and conceded that the article relied upon by Boelter was authoritative. In addition, there was support for Boelter's opinion in Doumouras' report, which stated that the vent pipe was too close to the air intake unit, causing sterilizer exhaust gases to be vacuumed into the path of the air intake. Likewise, Dr. Coe conceded that Dr. Hessl's methods were generally accepted by the medical community. Any concerns defendants may have with the specific procedures and conclusions of Boelter and Dr. Hessl, then, went to the reliability and weight of their testimony, not to the admissibility of that testimony. See *People v. Dalcollo*, 282 Ill. App. 3d 944, 957 (1996). Because there was factual support for the conclusions of Boelter and Dr. Hessl, the trial court erred in excluding their opinions and in granting summary judgment in favor of all defendants on the ground that plaintiffs could not prove proximate cause without expert testimony.

In reaching our conclusion that the trial court erred in barring plaintiffs' experts, we have reviewed the cases cited by the trial court in its ruling as well as those cited by defendants in support of their arguments on appeal. We find those cases to be distinguishable from the instant case because there was no factual basis for the expert testimony in each of those cases.

For example, the trial court and defendants have cited *Gyllin v. College Craft Enterprises, Ltd.*, 260 Ill. App. 3d 707 (1994), as support for the trial court's order barring plaintiffs' experts. In *Gyllin*, the plaintiffs in an automobile collision case appealed an order granting summary judgment in favor of defendants, claiming that their expert's testimony established a genuine issue of material fact. *Gyllin*, 260 Ill.

App. 3d at 715. The plaintiffs' theory was that the defendant driver had been overcome by vapors when he got into his car after he had spilled a large amount of stain on himself, causing him to cross over the center line into the path of plaintiffs' automobile. *Gyllin*, 260 Ill. App. 3d at 715. This court held that the expert's opinion that the driver could have experienced physical impairment due to the inhalation of vapors was mere conjecture and was not based upon concrete facts, because the driver had expressly denied experiencing any physical impairment as a result of inhaling the stain. *Gyllin*, 260 Ill. App. 3d at 716. Here, in contrast, there was factual support for the opinions of Boelter and Dr. Hessl.

For the same reason, the present case is distinguishable from this court's decision in *People v. Thill*, 297 Ill. App. 3d 7 (1998). In *Thill*, as in *Gyllin*, the opinion of defendant's expert was so seriously flawed that it lacked the required foundation. *Thill*, 297 Ill. App. 3d at 12-13. The expert in *Thill* had testified that the defendant's use of an albuterol inhaler affected the reading on the defendant's breath test, which showed a blood-alcohol level of .11. *Thill*, 297 Ill. App. 3d at 8-9. The expert's conclusion that the total amount of albuterol inhaled an hour earlier would have been exhaled into the breathalyzer was contradicted by his earlier testimony that some of the albuterol would have been eliminated from the defendant's system by the time he took the breath test. *Thill*, 297 Ill. App. 3d at 13. Because the expert's conclusions were contradicted by his earlier testimony and were not supported by the evidence, we held that the trial court should have excluded the opinion of the defendant's expert. *Thill*, 297 Ill. App. 3d at 12-13.

We also do not find the decision in *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194 (5th Cir. 1996), to be persuasive in this case. In *Allen*, the plaintiffs filed suit against numerous defendants alleging that their decedent died from a brain cancer caused by exposure to EtO. *Allen*, 102 F.3d at 195. The United States Court of Appeals for the Fifth Circuit affirmed the district court's ruling that the opinions of plaintiffs' experts were inadmissible because the opinions lacked sufficient scientific grounding. *Allen*, 102 F.3d at 195. The court held that the experts' testimony was not sufficiently reliable because there was no epidemiological study that linked brain cancer to EtO exposure, any animal studies were inconclusive at best, and there was no evidence of the level of the decedent's occupational exposure to EtO. *Allen*, 102 F.3d at 195. The trial court and defendants have cited *Allen* for the proposition that, in order for an expert's opinion to be admissible, the expert must be able to quantitatively show that the plaintiff was exposed to a harmful level of EtO.

We do not read *Allen* as imposing a *per se* rule that in order to be

admissible an expert's opinion must always state the amount of EtO to which a plaintiff was exposed. In fact, the primary reason the court in *Allen* excluded the opinions of the plaintiffs' experts was that their conclusions that EtO exposure was linked to brain cancer were weakly supported, if not contradicted, by the evidence upon which the experts relied. *Allen*, 102 F.3d at 198. The fact that there was no scientific knowledge of the harmful level of exposure to EtO or information concerning the decedent's exposure to EtO merely provided additional grounds for excluding the experts' opinions. *Allen*, 102 F.3d at 199. Here, in contrast, there is no dispute that plaintiffs' symptoms have been linked to exposure to EtO. Further, there is evidence in the record concerning the OSHA permissible exposure limit to EtO. Because there was factual support for the conclusions of Boelter and Dr. Hessl, any questions concerning whether plaintiffs were in fact exposed to harmful levels of EtO go to the weight of the testimony of Boelter and Dr. Hessl.

Finally, defendants rely on *Schmaltz v. Norfolk & Western Ry. Co.*, 878 F. Supp. 1119 (N.D. Ill. 1995), in support of their claim that Dr. Hessl's testimony was properly barred by the trial court. In *Schmaltz*, the plaintiff alleged that he suffered an asthma-type respiratory syndrome as a result of his exposure to two herbicides while working for the defendant. *Schmaltz*, 878 F. Supp. at 1120. The district court granted the defendant's motion to bar plaintiff's experts, one of whom was Dr. Hessl, on the ground that the opinions of plaintiff's experts were not grounded in scientific method. *Schmaltz*, 878 F. Supp. at 1124. The district court noted that Dr. Hessl had acknowledged that there were no documented cases in which exposure to the herbicides had caused the condition suffered by plaintiff and held that Dr. Hessl's conclusions thus were not supported by sufficient validation to be admissible. *Schmaltz*, 878 F. Supp. at 1122.

We do not find *Schmaltz* to be on point. As discussed previously, there is no dispute in this case that plaintiffs' symptoms have been associated with exposure to EtO. Defendants' expert testified that Dr. Hessl's methods were accepted by the medical community. Unlike *Schmaltz*, then, Dr. Hessl's conclusions in this case were supported by sufficient validation and should have been admitted into evidence.

Because the trial court erred in finding that the opinions of plaintiffs' expert witnesses were speculative and uncertain, we reverse the trial court's order barring those experts and granting summary judgment in favor of defendants and remand the case for further proceedings consistent with this opinion.

■ Plaintiffs also contend that the trial court erred in barring Boelter from conducting quantitative testing at the Centre and then

ruling that Boelter's opinion was inadmissible because he did not do any quantitative testing. Because we have held that the trial court erred in barring Boelter's testimony, we need not address this specific issue. We do note, however, that a trial court is afforded great latitude in ruling on discovery matters and its rulings should not be disturbed absent a manifest abuse of discretion. *D.C. v. S.A.*, 178 Ill. 2d 551, 559 (1997). Upon review of the record in this case, we do not find the trial court's order barring Boelter from conducting certain tests to be a manifest abuse of discretion.

The pleadings in this case show that plaintiffs filed a motion to compel alleging that their attorney had spoken with the attorney for Jafaris and Olsen and had requested that Boelter be allowed to conduct a four- to eight-hour on-site inspection of the Centre, which might include, *inter alia*, smoke bomb testing. Defendants' attorney objected that the inspection was unreasonable and that plaintiffs had previously conducted an inspection of the premises. The trial court granted plaintiffs' motion to compel but limited the inspection to four hours and barred plaintiffs from performing any destructive testing, from removing any siding or wall panels, and from releasing any smoke or other gases. Plaintiffs then filed a motion to modify the inspection limits, contending that their expert needed to look behind, under, and/or above ceiling tiles. To their motion to modify plaintiffs attached an affidavit of Boelter that stated that he could not render a complete opinion without lifting ceiling tiles or otherwise investigating accessible spaces associated with the mechanical systems of the building. Boelter's affidavit also stated that he would look only at those areas absolutely necessary for the rendering of a complete opinion and that he would conduct no destructive testing or sampling. The trial court granted plaintiffs' motion to modify. Because, in their motion to modify, plaintiffs did not request that Boelter be allowed to conduct smoke or gas tests, plaintiffs cannot now complain that the trial court abused its discretion in barring Boelter from performing such tests.

Finally, because we reverse the trial court's orders barring plaintiffs' experts from testifying and granting summary judgment in favor of defendants, we will address the cross-appeal of the Swissler defendants. The Swissler defendants contend that the trial court erred in denying their motion for summary judgment on the ground that a question of fact existed as to whether the Swissler defendants breached their duty of care to plaintiffs and whether the Swissler defendants proximately caused plaintiffs' injuries. The Swissler defendants claim that this court may review the trial court's order denying their motion for summary judgment on the issues of duty and proximate cause because the trial court entered a final order in this case.

■ Although the denial of a motion for summary judgment generally is not appealable, the Swissler defendants are correct that a reviewing court may consider the propriety of the denial of a motion for summary judgment if the appeal is from a final judgment and no trial or hearing has been conducted. *DePluzer v. Village of Winnetka*, 265 Ill. App. 3d 1061, 1064 (1994). The trial court's decision in this case was final and appealable because it disposed of the entire controversy between the parties. Accordingly, we may consider the propriety of the denial of the Swissler defendants' motion for summary judgment.

■ Summary judgment should be granted only when the moving party's right to judgment is clear and free from doubt. *In re Estate of Hoover*, 155 Ill. 2d 402, 410 (1993). In considering a motion for summary judgment, a court must construe the pleadings, depositions, affidavits, and admissions on file strictly against the moving party and liberally in favor of the nonmoving party. *Estate of Hoover*, 155 Ill. 2d at 410-11. A motion for summary judgment must be denied if there is a material issue of genuine fact. *Estate of Hoover*, 155 Ill. 2d at 411. Where there is a dispute as to material facts, or where reasonable persons might draw differing inferences from the undisputed facts, a triable issue of facts exists. *Estate of Hoover*, 155 Ill. 2d at 411.

The Swissler defendants claim that, because they complied with the 3M installation guide and installed the EtO vent line at least 25 feet from the air intake servicing Dr. Malik's office, plaintiffs cannot show that the Swissler defendants breached their duty of care. The Swissler defendants note that the legal duty owed by an independent contractor is defined by contract and an independent contractor is negligent only where it fails to follow specifications for the work that is to be done or where the contractor should have known that following the specifications was dangerous (*Hunt v. Blasius*, 74 Ill. 2d 203, 209 (1978)). The Swissler defendants also contend that plaintiffs cannot establish proximate cause because plaintiffs' experts could not testify that plaintiffs were exposed to EtO at the Centre.

■ Construing the pleadings, depositions, affidavits, and admissions on file strictly against the Swissler defendants and liberally in favor of plaintiffs, we find that the trial court properly denied the Swissler defendants' motion for summary judgment. Despite the Swissler defendants' claim that they complied with the 3M installation guide in installing the vent pipe, we find that there is a material issue of fact concerning whether the Swissler defendants properly followed the specifications. Boelter testified in his deposition that the pipe used by the Swissler defendants to vent the EtO was larger than that specified in the installation guide and that the larger pipe may not have

been able to fully purge the EtO from the system. Boelter testified that the pipe installed by the Swissler defendants had seven bends in it even though the installation manual said to minimize the number of bends in the pipe. Boelter also testified that the obstructions present in the configuration of the Centre required a greater distance between the vent pipe and the air intake system. Boelter's testimony, thus, raised a material issue of genuine fact concerning whether the Swissler defendants breached their duty of care to plaintiffs. Accordingly, the Swissler defendants were not entitled to summary judgment on that issue.

In addition, as noted by the trial court, the testimony of Boelter and Dr. Hessl, if allowed into evidence, would raise a material issue of genuine fact concerning whether plaintiffs had been exposed to harmful levels of EtO because the EtO from the vent pipe was entrained and circulated into Dr. Malik's office. Accordingly, the Swissler defendants were not entitled to summary judgment in their favor on the issue of proximate cause. The trial court, therefore, properly denied the Swissler defendants' motion for summary judgment.

For all of the foregoing reasons, the judgment of the circuit court of Du Page County barring plaintiffs' experts from testifying and granting summary judgment in favor of all defendants is reversed, and the cause is remanded for further proceedings consistent with this decision. The judgment of the circuit court of Du Page County on the Swissler defendants' cross-appeal is affirmed.

Affirmed in part and reversed in part; cause remanded.

COLWELL and RAPP, JJ., concur.